Filed 9/23/19; Certified for publication 10/15/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SOLOMON ODUYALE, | D073755 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU09627) |
| CALIFORNIA STATE BOARD OF PHARMACY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, L. Brooks Anderholt, Judge. Reversed.

Xavier Becerra, Attorney General, Linda K. Schneider, Assistant Attorney General, Antoinette Cincotta and Stephen A. Aronis, Deputy Attorneys General, for Defendant and Appellant.

Mazur & Mazur and Janice R. Mazur; Ronald S. Marks, for Plaintiff and Appellant.

# I.

## INTRODUCTION

In July 2013, the Executive Officer of the California State Board of Pharmacy (the Board) filed an accusation against pharmacist Solomon Oduyale, citing 20 charges for discipline and seeking revocation of his pharmacist license. By August 2016, Oduyale had successfully challenged all but nine of the charges for discipline against him. The Board then ordered Oduyale's pharmacist license revoked.

Oduyale challenged the Board's decision, filing a petition for writ of mandate, arguing the Board lacked justification for revoking his license, and suggesting it could have imposed stringent conditions on probation instead. The superior court did not draw a conclusion about the propriety of the revocation decision, but it concluded that because the Board's decision did not include an explicit discussion of each possible level of discipline with an explanation for why each would have been inappropriate in Oduyale's case, the Board had committed an abuse of discretion. The superior court entered judgment, ordering the Board to reconsider the disciplinary action, discussing "each and every form of discipline, short of revocation, . . . explain[ing] why those lesser forms of discipline are insufficient to protect the public."

The Board appeals to this court, challenging the trial court's requirement that it discuss every possible form of discipline short of revocation in its written decision and also asks us to consider whether it acted within its discretion to revoke Oduyale's pharmacist license based on the nine causes for discipline. Oduyale has cross-appealed, contending the trial court erred by remanding the matter for further consideration by the

2

Board and arguing the court should have directed the Board to impose a penalty short of revocation.

As we explain, we agree with the Board; the trial court erred by directing it to provide in writing its reasoning for not imposing each penalty short of revocation. Further, we conclude the Board acted within its discretion to revoke Oduyale's pharmacist license. Accordingly, we reverse the trial court's judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Oduyale's Licensing Probation History*

Oduyale received his pharmacy degree in North Dakota in 1979 and his California pharmacist license August 8, 1989. On April 29, 2005, the Executive Officer of the Board filed an accusation against Oduyale alleging sixteen causes for discipline and seeking revocation or suspension of his pharmacist license. Nine of those causes for discipline related to an incident that occurred in December 2002, and the other seven related to a 2004 pharmacy inspection.

On December 31, 2002, Oduyale was driving along a freeway when he was stopped by police. The police officer observed unlabeled prescription bottles, which Oduyale said contained Xanax, Vicodin, Viagra, Claritin, and an antibiotic. The officer also found loose in Oduyale's pockets prescription pills, later identified as Viagra, Floxin, and naproxen, and the officer found medications in the rear floor boards. In the trunk, police found a prescription bottle containing the antibiotic Levaquin labeled for a person in Coachella, CA. The officer arrested Oduyale for possession of controlled substances

3

and possession of a dangerous weapon, a wooden billyclub with a silver metal end, which was on the floor of the vehicle.

Oduyale had explanations for most of the medications, and the Board concluded there was insufficient evidence to establish Oduyale illegally possessed, furnished, or transported the Vicodin or the Xanax or acted fraudulently to obtain the medications for customers.

In March 2004, the Board inspected the pharmacy where Oduyale was the pharmacist-in-charge from January 2003 to March 2005. Oduyale was cooperative and made efforts to comply with multiple requests for records, but he was not able to produce all the requested items, and some of the items contained errors. For the period of January through March 2004, the records regarding acquisition and disposition of drugs contained cross-outs, corrections, and omissions, as well as records and inventory that indicated the pharmacy's perpetual log was not accurate. Oduyale also did not have a quality assurance program in effect for the pharmacy, there was no program to document medication errors attributable to the pharmacy and its personnel, and it did not have a Drug Enforcement Agency (DEA) Inventory, as required. Further, the pharmacy allowed drug deliveries to be received by non-pharmacists the entire time he was in charge. The Board concluded Oduyale failed to keep accurate and complete records of the acquisition and disposition of some of the controlled substances at the pharmacy.

Following charges for discipline and a hearing, the Administrative Law Judge (2006 ALJ) viewed Oduyale as "a caring individual who tries to reach out and help those in need," who "gives all his customers a personal touch," and whose "reputation in the

4

medical community [is] as a good pharmacist who is smart, kind-hearted and helpful to everyone." The 2006 ALJ concluded Oduyale "played fast and loose with some of the rules when it comes to helping his poor or elderly customers."

The 2006 ALJ found cause existed to discipline Oduyale for engaging in unprofessional conduct by possessing controlled substances in containers without correct labeling, in violation of state laws and regulations. (Bus. & Prof. Code, §§ 4301, subds. (o), (j) & 4060; Health & Saf. Code, §§ 11350, subd. (a) & 11377, subd. (a).) The 2006 ALJ also found cause to discipline Oduyale because the records required were not readily available, and the record keeping system was poor and records were incomplete.

The 2006 ALJ explained that Oduyale needed to be retrained so he understood he could not bend the rules to help someone, and it would not be against the public interest to allow him to continue to work as a pharmacist subject to probation. Accordingly, the 2006 ALJ recommended revocation of Oduyale's license, with a stay of the revocation coupled with probation for three years. In May 2006, the Board adopted the proposed decision, with the additional condition that he was not to supervise any ancillary personnel. Oduyale successfully completed probation December 20, 2009.

B. *Cal-Mex Pharmacy Licensing*

In late June 2010, Calmex Special Services, Inc., dba Cal-Mex Pharmacy (Cal-Mex) applied for a pharmacy permit. Oduyale, who was the company's president, indicated he would be the pharmacist-in-charge. In late November 2010, the Board denied the application based on Oduyale's previous disciplinary actions. Cal-Mex

5

challenged the decision, and the parties entered a Stipulated Settlement and Disciplinary Order (Stipulated Settlement) in May 2011.

Under the terms of the Stipulated Settlement, the Board agreed to issue a license to Cal-Mex and immediately revoke it, then stay the revocation and place the pharmacy on probation for 35 months. The probation required the pharmacy's officers to follow all state and federal laws and regulations. Among other things, it also required all owners and holders of 10 percent or more of the interest in the pharmacy to read and be familiar with state and federal laws and regulations governing the practice of pharmacy. The Stipulated Settlement permitted Oduyale to be the pharmacist-in-charge.

### C. *Pharmacy Board Inspection*

On January 28, 2013, Board inspectors performed a routine, unannounced inspection of Cal-Mex pharmacy, at which Oduyale was present. The inspectors reviewed hundreds of prescriptions, wholesale invoices, the quality assurance binder, and additional documentation provided by the pharmacy, and the inspectors interviewed pharmacy personnel, including Oduyale. The inspection report noted that refill requests were presented on preprinted forms, faxed prescriptions were accepted without a handwritten signature, and controlled medications were dispersed from preprinted prescription blanks, all prohibited practices. Not all the inspectors' questions were answered, and they were not able to reconcile some information with prior records, so

6

there was a second inspection in March 2013.  The second inspection did not resolve the questions and concerns.[1]

D.  *Disciplinary Charges*

In early July 2013, the Executive Officer of the Board filed an accusation against Oduyale's license and a petition to revoke Cal-Mex's probation.  The accusation was amended in July 2014 and included twenty causes for discipline.[2]  Oduyale filed a notice of defense with the Board of Pharmacy and requested an administrative hearing.  Hearings were held over nine days before an administrative law judge (the 2015 ALJ) in December 2014 and March 2015.  The second cause for discipline was dismissed at the Board's request, and the 2015 ALJ dismissed the eighth and eleventh causes for discipline.  That May, the 2015 ALJ issued a proposed decision revoking Oduyale's pharmacist license.  The Board adopted the 2015 ALJ's proposed decision based on the remaining 17 causes for discipline in late June 2015, with an effective date of July 29, 2015.

Both parties requested reconsideration; Oduyale sought reversal of the revocation of his license, and the Executive Officer asked the Board to revoke the Cal-Mex permit.

---

[1]     In April 2014, the DEA performed a complete inspection of the pharmacy, after which it identified two record-keeping violations.  The DEA subsequently renewed Cal-Mex's unrestricted DEA registration, and these violations were not used as a basis for the Board's disciplinary charges against Oduyale.  Accordingly, we do not detail them here.

[2]     Some of the charges for discipline were against Oduyale and others were against Oduyale and Cal-Mex pharmacy.  Because this appeal regards only Oduyale, we do not address the charges against the pharmacy.

The Board denied Oduyale's request for reconsideration and granted the Executive Officer's request for reconsideration.

### E. *First Petition for Peremptory Writ of Mandate*

On July 20, 2015, Oduyale filed a petition for peremptory writ of mandate to set aside the revocation of his license. He also requested a stay of the decision, which the court denied. In its August 2016 judgment, the superior court set aside the third, fourth, tenth, twelfth, fifteenth, sixteenth, nineteenth, and twentieth causes for discipline, in most instances because the court determined they were not supported by the weight of the evidence. The court remanded the matter to the Board to reconsider the penalty in light of the remaining nine causes for discipline. Neither party appealed this judgment.

### F. *Causes for Discipline*

Following the judgment by the Superior Court in Imperial County, there were nine sustained causes for discipline:

#### 1. *First Cause: Failure to Maintain Acquisition and Disposition Records*

The first cause for discipline was brought for failure to maintain acquisition and disposition records and failure to keep inventory for hydrocodone/acetaminophen 10mg/325mg (Norco) from May 1, 2012 through January 28, 2013. The court acknowledged there was no evidence of theft or diversion of pills; however, the poor record-keeping, a requirement in place to avoid theft or diversion, was cause for concern.

#### 2. *Fifth Cause: Deviation of Prescription Instructions*

The fifth cause for discipline was brought for deviation from prescription instructions without documentation or consent of the prescriber of four prescriptions.

8

The court commented that the deviations were significant enough to cause concern about patient welfare even when considered against the thousands of prescriptions dispensed during the audit period. These deviations included an order that the prescriber issued to take Lorazepam[3] every 8-12 hours, which the pharmacy changed to take it every 8-12 hours as needed for pain. The pharmacist also changed the order for hydrocodone/APAP[4] to be taken "every 8 hours as needed" to a standing order directing the patient to take it "every 8 hours." An Ambien[5] prescription was changed from an instruction to take it "every night at bedtime for 7 weeks" to take it "every night at bed as needed for sleep." Finally, the last deviating prescription for Testim was changed from "apply 1/2 tube daily to shoulders" to "apply daily as directed."

3. *Sixth and Seventh Causes:  Lacking Controlled Substance Forms*

The sixth and seventh causes for discipline related to the dispensing of 24 prescriptions for controlled substances that were not written on controlled substance forms. The controlled substance forms are required to ensure a prescription is not

---

[3]     Lorazepam is a Schedule IV controlled substance (Health & Saf. Code, § 11057, subd. (d)) and a dangerous drug (Bus. & Prof. Code, § 4022).

[4]     Hydrocodone/acetaminophen is a narcotic Schedule III controlled substance (Former Health & Saf. Code, § 11056, subd. (e)(4)) and a dangerous drug (Bus. & Prof. Code, § 4022).  It is known by brand names Vicodin, Norco, Zydone, Maxidone, Lortab, Lorcet, Hydrocet, Co-Gesic, and Anexsia, and it is used as a narcotic analgesic for pain relief.

[5]     Ambien is a brand name for Zolpidem, which is a Schedule IV controlled substance (Health & Saf. Code, § 11507, subd. (d)) and a dangerous drug (Bus. & Prof. Code, § 4022) used for short-term treatment of insomnia.

counterfeit. Additionally, although Oduyale told the inspector he verified the prescriptions that were not written on the proper controlled substance form, he did not provide copies of those verifications during the first inspection on January 28, 2013. When he later sent them around February 1, the inspector discovered 24 prescriptions lacked verifications, and despite her subsequent requests for documentation of the verifications, she did not receive them. Although Oduyale provided documents purporting to be the verifications at the administrative hearing, they were printed copies of whatever information had been in the computer system, not true verifications.

### 4. *Ninth Cause: Missing Documentation of Prescriber Names*

The ninth cause for discipline was for failing to document or obtain the name of the agent of the prescriber who transmitted oral prescriptions for 39 controlled substance prescriptions. The court concluded Oduyale's methods for verifying prescriptions were haphazard at best, and the individuals his staff claimed verified the prescriptions did not work for the prescribing doctor. Although no evidence indicated the identified doctor denied prescribing the medications, the court concluded the records in question were insufficient to ensure the pharmacy was avoiding potential abuse.

### 5. *Thirteenth Cause: Falsely Edited Verifications of Prescriptions*

The thirteenth cause for discipline was for knowingly making a document that falsely represents the existence of facts, based on written verifications Oduyale supplied the Board. Several original prescriptions were faxed or written, and they required verifications. Oduyale provided verifications with edited "backers," which are notes regarding dispensing the medicine written on the back of the original prescriptions. The

10

verifications had discrepancies when compared to the original documentation. The 2015 ALJ found Oduyale's explanations lacked credibility and determined the verifications were created at a later time.

6. *Fourteenth Cause: Failure to Exercise and Implement Best Professional Judgment*

The fourteenth cause for discipline was brought for failure to exercise and implement the best professional judgment. The court concluded the weight of the evidence against Oduyale for the fifth cause for discipline, deviating the instructions and requirements on the medication, supported this charge.

7. *Seventeenth Cause: Gross Negligence*

In finding the weight of the evidence supported the seventeenth cause for discipline, the court concluded Oduyale was grossly negligent for relabeling five bags of intravenous oxytocin[6] at Pioneer Memorial Hospital.[7] On February 26, 2014, while working as a pharmacist at the hospital, Oduyale prepared labels for sterile compounded bags of oxytocin, which were expired. The drug manufacturer had never provided data or authorized the extension of the drug beyond its assigned 28 days. Oduyale testified he had looked for compounded oxytocin bags, but they were all expired by one or two days, and he could not get oxytocin from another hospital or retail pharmacy because they were

---

[6] Oxytocin is a dangerous drug. (Bus. & Prof. Code, § 4022.) It can be used to induce labor or increase its speed.

[7] Oduyale notes that there is some ambiguity regarding the court's finding with respect to the seventeenth cause for discipline because the original cause for discipline charged Oduyale with gross negligence for relabeling, verifying, and dispensing oxytocin while the court's finding only explicitly referenced relabeling.

11

closed. He shook the compound bags and inspected them against the light to see if he could observe any particulates in the fluid, and he squeezed the bags to determine if there was leakage. Because the bags looked stable, he decided to extend the beyond-use date on four or five bags. He did not inform anyone he had done this.

John Paul Teague, the pharmacist-in-charge at the hospital, terminated Oduyale's employment as a result of these actions. He explained if a patient in labor were not progressing on inefficient medication, a doctor could order a higher dosage, which might be excessive when full-strength medication was subsequently administered; thus, extending the expiration dates created a potential for harm.

The court also considered literature, which indicates the compounded oxytocin could have beyond-use dates of 31 days if the bags were refrigerated and sterility tests were conducted; however, it noted there was no evidence either of those things occurred. Additionally, Elvira Martinez Gonzalez, a licensed pharmacy technician employed by the hospital for 13 years, testified the pharmacy had concentrated vials of oxytocin for compounding if the bags they had were all expired, and there were multiple unexpired vials of oxytocin available; thus, there was no need or emergency to justify extending the expiration date. She also testified it was against hospital policy to use expired drugs.

Oduyale offered testimony from expert Anna K. Brodsky, who initially testified that "[i]f the literature supported a date extension, there were no precipitates visible, the bag was stored under good conditions and the hospital policy allowed the pharmacist to change the date, then the pharmacist could properly exercise his or her professional judgment to extend the date." Under cross-examination, she admitted she was not aware

12

of any literature supporting a determination that compounded oxytocin bags remained sterile after 28 days, and she would send the product to a lab to determine if they remained stable and sterile. She also testified a pharmacist could not see microprecipitates by looking at a compounded drug product.

### 8. *Eighteenth Cause: False Report of Expiration Date of Oxytocin*

The eighteenth charge for discipline, for knowingly making a document that falsely represents the existence of facts, was based on Oduyale's conduct at Pioneer Memorial Hospital. The court concluded the weight of the evidence supported this violation because Oduyale altered the expiration dates.

### G. *The Board's Revocation Decision*

After the Board received the court's decision, it invited written argument from both parties, which it received. The Board's subsequent decision explained it had evaluated the criteria provided by the Board of Pharmacy Disciplinary Guidelines and regulations. There was no evidence of harm occurring to Cal-Mex customers or Pioneer Hospital patients; however, the Board noted actual harm is not required to establish a nexus between misconduct and fitness to practice. The Board noted its primary goal is to protect the public before harm occurs, and it explained: "Even with the causes of action dismissed pursuant to the Imperial Court's decision, the multiple instances of failure to comply with laws and regulations applicable to pharmacies and pharmacists are serious and present[ ] a significant potential of harm to the public."

The Board wrote: "The seriousness of the violations is underscored by the undeniable evidence that, for all his years of experience, Respondent Oduyale does not

13

appear to understand the basic principles of operating a pharmacy and is incapable of running an orderly and compliant pharmacy." It commented that the 2006 conclusion that he " 'played fast and loose' " with some of the rules was equally applicable to the present charges, and his relabeling of oxytocin shows a "fundamental lack of understanding of compounding, expiration dates, the requirement to document and notify others when medications are altered, and hospital policies." It found Oduyale's "cavalier attitude and lack of understanding of the serious nature of his misconduct in the context of the practice of pharmacy" to be alarming.

The Board expressed concern about "[r]ecord keeping deficiencies and the pervasive failure to attend to detail" dating back to 2005, and it commented that Oduyale did not seem "fundamentally capable or willing" to get the issues under control. It stated there was no good explanation for how documents obtained at the initial inspection were reproduced later as different documents.

Separating Oduyale's personal qualities as a kind and generous man who cares about his customers and community from his competence as a pharmacist, the Board concluded Oduyale was not competent based on his lack of understanding of the rules, regulations, and policies and his inability to conform to them. It explained Oduyale's "failure to maintain complete control and an inability to demonstrate complete control through clear and organized files, invites abuse and presents a significant potential of harm to the public[,]" even without evidence of diversion or theft of drugs. It found: "Even after excluding the causes of action pursuant to the Imperial Court's decision, the remaining causes and the prior history clearly reflect that public protection can only be

14

accomplished if Respondent Oduyale can no longer practice as a pharmacist." In January 2017, the Board ordered Oduyale's license revoked.

## H. *Second Petition for Writ of Mandate*

Oduyale filed a petition for writ of mandate requesting the court to instruct the Board to set aside the revocation and to impose a lesser penalty. He argued there was no justification for revoking his license because the Board could have imposed stringent conditions on probation instead. He also contended that because there was no harm to the public, and no Category IV offenses, no reasonable person would conclude placing conditions of probation on him would be inadequate.

## I. *Second Writ Petition Hearing*

At the hearing on the petition for writ of mandate, the court considered four issues: (1) whether the Board's written decision after remand violated due process because Oduyale contended it was written by the Attorney General rather than the Board; (2) whether the requests for judicial notice had been granted and if not, the grounds for denial; (3) whether the penalty imposed by the Board was a manifest abuse of discretion; and (4) whether there was a factual basis for revocation.[8]

The court explained it was looking at the matter de novo, reviewing the remaining violations, the prior history, what led to the charges, and whether there was a manifest

---

[8] The first two issues were not raised on appeal. The court concluded there was no evidence the decision was drafted by the Attorney General. The court denied three of Oduyale's requests for judicial notice and granted the rest. It denied the Board's requests for judicial notice because they were all legal citations, of which the court concluded it did not need to take judicial notice to consider.

abuse of discretion in how the Board handled the revocation. It also asked where in the administrative record there was evidence that the Board had considered levels of discipline less than revocation and explained why those would not be appropriate.

The court commented: "[I]f the board did not discuss something less than revocation, that is a potential manifest abuse of discretion." Although the court recognized there was a paragraph stating the Board had considered its discipline options, the court also noted the Board did not "address the full range of what [it could] do and why won't it work," and the court explained it was looking for something in the decision that offered reasoning for why the Board had not imposed discipline less than revocation.

The court entered judgment January 31, 2018, remanding the matter to the Board and directing it to address in its decision each and every form of discipline, short of revocation, and explain why those lesser forms of discipline were insufficient to protect the public. The Board timely filed a notice of appeal, and Oduyale timely filed a notice of cross-appeal.

III.

DISCUSSION

A. *The Board Provided an Adequate Record*

First, the trial court committed error when it concluded the Board manifestly abused discretion by failing to discuss all lesser forms of discipline before reaching its decision to revoke Oduyale's license. We disagree with its finding that the Board failed to provide an adequate record to determine whether it fully reconsidered the penalty, as it previously had been instructed to do.

16

Code of Civil Procedure, section 1094.5, subdivision (b) provides that when there is a petition for writ of mandamus, the court should inquire as to whether there was any prejudicial abuse of discretion, including instances in which the administrative order or decision " 'is not supported by the findings, or the findings are not supported by the evidence.' " (*Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 (*Topanga*).) In *Topanga,* the Supreme Court explained an administrative body must render findings sufficient to enable the parties to determine whether and on what basis they should seek review and, in the event of review, apprise the reviewing court of the basis for the board's action. (*Id.* at pp. 513-514.) Thus, the agency rendering a decision must "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.* at p. 515.)

B. *The Board Was Not Obligated to Detail Every Possible Disciplinary Action*

While *Topanga* requires findings to bridge the gap between the evidence and an agency's decision (*Topanga, supra,* 11 Cal.3d at p. 515), it does not require the Board to outline all the reasons it opted not to impose a lesser form of discipline. It is only required to justify the penalty imposed, including "a statement of the factual and legal basis for the decision." (Gov. Code, §§ 11425.10, subd. (a)(6) & 11425.50, subd. (a).) Here, our independent review confirms the Board has done this.

In its statement of decision, the trial court looked for abuse of discretion, which it described as occurring if the findings were not supported by the weight of the evidence, citing Code of Civil Procedure section 1094.5, subdivision (c) and *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143. It explained that "abuse of discretion is established if the court

17

determines that the findings are not supported by the weight of the evidence." It then explained it was the trial court's responsibility to resolve questions of credibility based on the record and opined that the record did not reflect "any sort of actual deliberation and consideration by the Board of measures short of full revocation as a means of protecting the public."

This was the incorrect standard of review at this point in the proceeding. Code of Civil Procedure section 1094.5, subdivision (c) applies when a party claims the findings are not supported by the evidence. In those cases, the court evaluates whether there is an abuse of discretion by considering the weight of the evidence. (Code Civ. Proc., § 1094.5, subd. (c); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817; see *Hoang v. California State Bd. of Pharmacy* (2014) 230 Cal.App.4th 448, 454-455.) Here, the findings had already been established by the court following the first writ proceeding, and those conclusions were not challenged in an appeal.[9] Accordingly, those findings govern the outcome here.

Instead, Oduyale challenged whether the Board had proceeded in the manner required by law, which is reviewed for abuse of discretion as defined in subdivision (b) of

---

[9] The parties agree that the Board could consider the allegations sustained by the trial court's decision following Oduyale's first petition for writ of mandamus.

Code of Civil Procedure section 1094.5.[10] Because the previous writ judgment had already determined which findings were supported by the evidence, here the court's evaluation of whether there was a prejudicial abuse of discretion by the Board was limited to whether the Board's revocation decision was supported by those findings. (*Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 435; see also *Topanga, supra,* 11 Cal.3d at pp. 514-515.)

The trial court concluded the Board's Decision after Reconsideration and Remand (Board Decision) "does not reflect any sort of actual deliberation and consideration by the Board of measures short of full revocation as a means of protecting the public." It also concluded the invitation to submit additional briefing, standing alone, was not sufficient to demonstrate the Board fulfilled its duty in light of the first writ of mandate. Although it recognized the Board Decision identified its rationale for revocation in one paragraph, it also noted the Board Decision "offer[ed] no articulation whatsoever of any effort to fairly analyze whether any measure or restriction short of outright revocation of Respondent Oduyale's license would protect the public, while enabling him to earn a living at his chosen profession." Still, the court did not directly conclude the findings failed to support a decision to revoke Oduyale's pharmacist license. Instead, it explained

_____

10    Oduyale's supplemental request for statement of decision indicated he was challenging the fairness of proceedings based on his allegation that the deputy attorney general drafted the remanded Board decision; Oduyale did not contend directly that the Board's failure to describe lesser penalties in its written decision violated his due process rights. Oduyale separately argued there was a manifest abuse of discretion in imposing revocation of his license because, he alleged, there were lesser penalties that would be effective.

19

it could not assess whether revocation was the appropriate remedy based on the nine causes for discipline because the record did not detail the rationale for declining to impose discipline short of revocation.[11]

However, there is no legal requirement to explicitly discuss, consider, and explain the rejection of all forms of discipline short of the one selected, and the trial court's writ directing the Board to "discuss each and every form of discipline, short of revocation, and explain why those lesser forms of discipline are insufficient to protect the public" was erroneous. So long as the findings "enable the reviewing court to trace and examine the agency's mode of analysis" (*Topanga, supra,* 11 Cal.3d at p. 516), there is no abuse of discretion under Code of Civil Procedure section 1094.5, subdivision (b).

After reviewing the record for its sufficiency in enabling us to determine whether the factual determinations support the Board's decision, we reach a different conclusion about the Board's compliance with its responsibility to determine an appropriate disciplinary action. To determine whether a decision is supported, we require the findings to "bridge the analytic gap between the raw evidence and ultimate decision or order" so that we need not "speculate as to the administrative agency's basis for decision." (*Topanga, supra,* 11 Cal.3d at p. 515.) Moreover, we "must resolve reasonable doubts in favor of the administrative findings and decision." (*Id.* at p. 514.)

---

[11]  At the hearing, the court commented, "Revocation may be the appropriate conclusion in this case, but failure to fully consider the case may or may not have been abuse of discretion."

20

The Board Decision stated that the Board reviewed and considered the entire record, including the transcript, exhibits, and written arguments for reconsideration and on remand before issuing its decision. It detailed the allegations and findings related to the disciplinary action against Oduyale in the 2005 action, the terms of Oduyale's probation, and its completion. It laid out each cause for discipline, the facts offered by the Executive Officer, Oduyale's response, and an evaluation of each of the causes.

It stated the purpose of discipline was not punishment, but instead "to protect the public from dishonest, immoral, disreputable, or incompetent practitioners." The Board explained Oduyale had been given correction notices and warnings, and although the pharmacy would remedy one problem, a new violation would exist during the next visit, or a previous violation would recur. Considering only the nine causes for discipline, it concluded their seriousness evidenced Oduyale's lack of understanding of the basic principles of operating a pharmacy, inability of running an orderly and compliant pharmacy. The Board determined that Oduyale continued to "play[ ] fast and loose" with the rules, and his re-labeling of oxytocin showed a "fundamental lack of understanding of compounding, expiration dates, the requirement to document and notify others when medications are altered, and hospital policies." Moreover, it found his "cavalier attitude and lack of understanding of the serious nature of his misconduct in the context of the practice of pharmacy . . . alarming."

This explanation bridges the findings and the Board's ultimate decision to revoke Oduyale's license because it explains the violations were serious, and they demonstrated a repeated inability or unwillingness to follow rules and a basic lack of understanding of

21

how to handle expired medications. The Board was concerned about "[r]ecord keeping deficiencies and the pervasive failure to attend to detail" dating back to 2005, and it commented Oduyale did not seem "fundamentally capable or willing" to get the issues under control. Thus, its explanation further connected Oduyale's actions and attitudes with the Board's decision to revoke the license because it determined an attempt at rehabilitation would not serve the public interest.

Oduyale argues that because the Board Decision is nearly identical to its previous decision, other than minor editing changes to reflect the court's reversal of eight of the original charges for discipline during the first writ proceeding, the Board did not reconsider the penalty in light of the court's actions. However, the Board's decision expressly states it focused only on the remaining causes for discipline and prior history, concluding that "public protection can only be accomplished if Respondent Oduyale can no longer practice as a pharmacist."[12] Moreover, as we explain *infra*, the Board's disciplinary decision is not a manifest abuse of discretion; its determination is supported by substantial evidence. (See *Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 217-218, 221 (*Landau*).)

---

[12] Oduyale's reference to *Pirouzian v. Superior Court* (2016) 1 Cal.App.5th 438 is unhelpful. *Pirouzian* held that the highest priority is protection of the public, and discipline should when possible "aid in the rehabilitation of the licensee" because punishment is not the goal. (*Id.* at p. 446.) However, the Board considered the possibility of rehabilitation here and concluded, in light of Oduyale's history, his repeated violations, and his incapability or unwillingness to get the issues under control, rehabilitation was not possible.

We are satisfied that the Board has "bridged the analytic gap" between raw evidence and its ultimate decision.[13]  Accordingly, we vacate the trial court's order instructing the Board to reconsider the penalty and to discuss each and every form of discipline short of license revocation, explaining why they are insufficient to protect the public.

C. *The Board's Disciplinary Action Was Not a Manifest Abuse of Discretion*

In its appeal, the Board asks us to exercise independent judgment and determine that the nine causes for discipline sustained during the first writ proceeding are sufficient to support the Board's revocation decision.  In his cross-appeal, Oduyale contends the revocation of his pharmacist license constitutes an abuse of discretion, and he asks us to direct the Board to impose a lesser penalty.  Having concluded there was no violation in the process the Board used to reach its decision, we next conclude there was no manifest abuse of discretion in the Board's determination that revocation was the appropriate penalty in this case, and we reverse the court's judgment.

1. *Standard of Review*

"[W]e review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency."  (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627 (*Cassidy*), citing *Antelope Valley*

_____

[13]     In its statement of decision, the trial court commented:  "[T]he record provided by the parties does not reflect any sort of actual deliberation and consideration by the Board of measures *short of full revocation* as a means of protecting the public."  (Italics added.) However, the Board was not obligated to do so, and the court did not conclude the Board failed to contemplate facts and deliberate as to whether revocation was appropriate, only that it failed to directly address why discipline short of revocation was not appropriate.

*Press v. Poizner* (2008) 162 Cal.App.4th 839, 851 and *Szmaciarz v. State Personnel Bd.* (1978) 79 Cal.App.3d 904, 921.) "In reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court. We review the actions of the [Pharmacy Board] to determine whether the discipline imposed constituted a manifest abuse of discretion." (*Landau, supra,* 81 Cal.App.4th at p. 217; *Intercommunity Medical Center v. Belshe* (1995) 32 Cal.App.4th 1708, 1711 [when facts not challenged, appellate court only determines if board's ruling was so arbitrary and capricious that it was an abuse of discretion].)

" 'The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' [Citation.]" (*Cummings v. Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652, quoting *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404.) " ' "In reviewing the exercise of this discretion we bear in mind the principle 'courts should let administrative boards and officers work out their problems with as little judicial interference as possible . . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' " ' [Citation.] 'The policy consideration underlying such allocation of authority is the expertise of the administrative agency in determining penalty questions.' [Citation.]" (*Cassidy, supra,* 220 Cal.App.4th at p. 633.)

A manifest abuse of discretion exists if the penalty was arbitrary, capricious, or patently abusive. (*Cassidy, supra,* 220 Cal.App.4th at pp. 627-628.) If reasonable minds

could differ over the appropriateness of a penalty imposed, there is no manifest abuse of discretion. (*Landau, supra,* 81 Cal.App.4th at pp. 218, 221; *Dresser v. Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 506, 519 ["The facts that reasonable minds might differ as to the propriety of the penalty imposed fortifies the conclusion that the administrative body acted within its discretion [citations]."]) " 'Even if a penalty were to appear to be too harsh according to the court's evaluation, the court is not free to substitute its own discretion for that exercised by the administrative agency.' " (*Landau,* at p. 221.)

Section 4300 of the Business and Professions Code authorizes the Board to discipline a pharmacist by suspending or revoking a license. Additionally, Business and Professions Code section 4001.1 places protection of the public as the highest priority for the State Board of Pharmacy in exercising its licensing, regulatory, and disciplinary functions; when that goal is inconsistent with other interests, the public's protection is paramount. (See *Sternberg v. California State Bd. of Pharmacy* (2015) 239 Cal.App.4th 1159, 1168-1169.)

### 2. *California State Board of Pharmacy Disciplinary Guidelines*

The California State Board of Pharmacy Disciplinary Guidelines identify 15 factors for the Board to consider in issuing a disciplinary decision.[14] (Cal. Dept. of Consumer Affairs, California State Board of Pharmacy, Disciplinary Guidelines (2007) p. 3 [hereafter Pharmacy Disciplinary Guidelines].) The Pharmacy Disciplinary Guidelines state "[n]o single one or combination of the . . . factors is required to justify the minimum and/or maximum penalty in a given case," and the recommended range of discipline within each category "assume[s] a single violation of each listed statute or regulation." (*Id.* at pp. 3, 5) When there are "multiple violations, the appropriate penalty shall increase accordingly." (*Id.* at p. 5.) Additionally, "if an individual has committed violations in more than one category, the minimum and maximum penalties shall be those recommended in the highest category." (*Ibid.*)

### 3. *Oduyale's Violations*

---

14     The factors the Board considers in determining penalties are: "1. actual or potential harm to the public[;] 2. actual or potential harm to any consumer[;] 3. prior disciplinary record, including level of compliance with disciplinary order(s)[;] 4. prior warning(s), including but not limited to citation(s) and fine(s), letter(s) of admonishment, and/or correction notices(s)[;] 5. number and/or variety of current violations[;] 6. nature and severity of the act(s), offense(s) or crime(s) under consideration[;] 7. aggravating evidence[;] 8. mitigating evidence[;] 9. rehabilitation evidence[;] 10. compliance with terms of any criminal sentence, parole, or probation[;] 11. overall criminal record[;] 12. if applicable, evidence of proceedings for case being set aside and dismissed pursuant to Section 1203.4 of the Penal Code[;] 13. time passed since the act(s) or offense(s)[;] 14. whether the conduct was intentional or negligent, demonstrated incompetence, or, if the respondent is being held to account for conduct committed by another, the respondent had knowledge of or knowingly participated in such conduct[; and] 15. financial benefit to the respondent from the misconduct." (Pharmacy Disciplinary Guidelines, at p. 3.)

Category I violations are those that are relatively minor but potentially harmful and for repeated violations of a relatively minor nature. (Pharmacy Disciplinary Guidelines, at p. 6.) The minimum penalty is one-year probation, revocation stayed, or revocation, and the maximum penalty is revocation. (*Ibid.*) Oduyale's fifth cause for discipline, for changing the instructions on four prescriptions, establishes four Category I violations. (*Ibid.*; Cal. Code of Regs., tit. 16, § 1716.)

Category II violations are those that create a serious potential for harm, involve a greater disregard for pharmacy law and public safety, and violations that reflect on ethics, care exercised, or competence. (Pharmacy Disciplinary Guidelines, at p. 11.) The minimum penalty for a single Category II violation is revocation, revocation stayed, or three years of probation, and the maximum penalty is revocation. (*Ibid.*) Oduyale was found to have committed Category II violations repeatedly. This includes the sixth and seventh causes for discipline because he dispensed 24 prescriptions for controlled substances that were not on the proper form. (Bus. & Prof. Code, § 4301, subd. (o); Health & Saf. Code, § 11164, subd. (a); & Cal. Code of Regs., tit. 16, § 1717.3, subd. (a); Pharmacy Disciplinary Guidelines, at pp. 13-14.) It also includes the ninth cause for discipline, for failure to document the name of the prescriber transmitting transcriptions for 39 prescriptions, a requirement to avoid potential abuse. (See Bus. & Prof. Code, § 4301, subd. (o); Health & Saf. Code, § 11164, subd. (b)(3).) Plus, it includes the thirteenth and eighteenth causes for discipline for knowingly making false statements. Oduyale was found to have provided prescription verifications with false "backers," which had discrepancies when compared to their originals and led the court to conclude

27

they were falsified, and he changed the label on oxytocin, improperly extending the expiration date. The Board believed that Oduyale's willingness to falsify documents was an indication he could not be rehabilitated.

Finally, the fourteenth and seventeenth causes for discipline are Category II violations. (Bus. & Prof. Code, §§ 4301, subd. (c) & 4306.5, subd. (b); Pharmacy Disciplinary Guidelines, at p. 13.) The finding of unprofessional conduct for failing to exercise best judgment in dispensing a drug was not about record-keeping; it was for changing instructions on prescriptions without consent from the prescriber to do so. The gross negligence finding was also specific to relabeling five bags of oxytocin to extend their expiration date for dispensing to pregnant patients.

Category III violations are recommended for, among other things, knowing or willful violations of laws or regulations pertaining to dispensing or distributing controlled substances, fraudulent acts committed in connection with a licensee's practice. (Pharmacy Disciplinary Guidelines, at p. 15.) The minimum penalty is revocation, revocation stayed, 90 days actual suspension, or three years of probation. (*Ibid.*) The maximum penalty is revocation. (*Ibid.*) Oduyale was found to have committed Category III violations over a nine-month period, from May 1, 2012 through January 28, 2013, by failing to properly maintain records of a controlled substance. The discrepancy was an overage of pills, and the Board noted that there was no evidence of theft or diversion of pills. However, it concluded that the inaccuracy, coupled with similar violations in 2006, indicated a problem.

4. *Substantial Evidence Supports the Board's Decision*

28

In his cross-appeal, Oduyale contends the evidence does not establish he is dishonest, immoral, disreputable, or incompetent, and thus revocation of his license is unnecessary to protect the public. To support his position, Oduyale cites findings that he was kind, generous, and caring, as well as letters of support and customer evaluations. He also contends that all but one of the sustained findings involved record-keeping violations and challenges the Board's conclusion that these findings demonstrate Oduyale was unable to properly run a pharmacy because, he argues, the violations only occurred during a three-month period and were not representative of his lengthy time in practice, and because the violations were corrected. Oduyale further contends that because a majority of the violations related to record-keeping, and because he previously successfully completed probation, there was not sufficient evidence that he is unfit to practice pharmacy. Finally, he suggests that because there had been no harm to the public, and he did not commit any Category IV offenses, revocation was not necessary to protect the public.

While the audit reviewed a three-month period of time during which there were prescription violations, nothing in the record suggests that these violations were outliers or not representative of Oduyale's practice on the whole, particularly in light of Oduyale's previous discipline, also based on prescription and inventory violations approximately a decade earlier. Moreover, while Oduyale was found to have committed Category II violations over the three-month period the audit reviewed, he was also found to have committed Category III violations over a nine-month period, from May 1, 2012 through January 28, 2013. Indeed, the repeated nature of Oduyale's violations influenced the

29

Board's decision; Oduyale would remedy one problem, but prior violations would reappear.

Additionally, although Oduyale downplays the seriousness of the findings, arguing that record-keeping violations do not demonstrate a lack of competence or implicate public safety, poor recording-keeping is cause for concern because absent appropriate documentation, there is opportunity for theft, diversion, and abuse. Additionally, some of the charges created serious potential for harm. For example, Oduyale did not dispute the inaccuracies of the four variances in prescription instructions that were the basis of the fifth cause for discipline, attributing the discrepancies to mistakes and oversights as a result of the high volume of prescriptions. However, the Board explained that a high volume of prescriptions does not mitigate or excuse the errors because accurate directions are essential to consumer safety. Additionally, when Oduyale relabeled the oxytocin bags at the hospital without directly informing anyone he had done so, he created potential for consumer harm because doctors could have increased the dosage to account for the inefficiency of expired medication, resulting in excessively medicating pregnant patients.[15]

The Board's conclusion that Oduyale's responses to these causes for discipline were cavalier and lacked an understanding of the serious nature of the misconduct

---

[15]  Although Oduyale argues in his reply brief that this action was not serious in nature because his expert opined that use of the expired oxytocin that evening was not contraindicated, the record indicates Brodsky ultimately reconsidered her opinion once she was aware of the specific facts and withdrew her conclusion that Oduyale had properly exercised professional judgment when he extended the date of the oxytocin.

30

support its determination that these violations are evidence that Oduyale is unfit to practice. Moreover, the Board expressed concern that Oduyale was not honest because of his willingness to knowingly provide false information, as demonstrated by the thirteenth and eighteenth causes for discipline.

Although there is evidence of Oduyale's kindness and generosity, this evidence does not eliminate the potential harm he created or allay concerns about his repeated violations, which occurred even after a previous opportunity for rehabilitation. Given the Board's directive to make public safety paramount (see *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 768), the Pharmacy Disciplinary Guidelines' direction to increase the penalty for multiple violations using the penalties in the highest category (Pharmacy Disciplinary Guidelines, at p. 5), and the Board's discretion in determining the appropriate disciplinary action (*Cassidy, supra,* 220 Cal.App.4th at p. 633), the nine sustained causes for discipline, coupled with Oduyale's disciplinary history, demonstrate a reasonable mind could reach the conclusion that revocation was the appropriate disciplinary action here. (See *Landau, supra,* 81 Cal.App.4th at pp. 218, 221 [no manifest abuse of discretion if reasonable minds could differ]; *Gubser v. Department of Employment* (1969) 271 Cal.App.2d 240, 245-246 [substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion].) Thus, we cannot conclude the Board's action was a manifest abuse of discretion.

## DISPOSITION

We reverse the trial court's judgment and vacate the order directing the Board to explicitly discuss all lesser forms of discipline and to explain why they are insufficient

for public protection.  We remand the matter to the trial court with instructions to enter judgment in the Board's favor and to dismiss the petition with prejudice.

The Board is entitled to costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


GUERRERO, J.

32

Filed 10/15/19

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SOLOMON ODUYALE, | D073755 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU09627) |
| CALIFORNIA STATE BOARD OF PHARMACY, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed September 23, 2019, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties

2